IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| HUGH LUSK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE No. 3:18-cv-00884-RAH-SMD |
| | ) | (WO) |
| DAEWON AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Hugh Lusk ("Lusk" or "Plaintiff"), a resident of Lee County, Alabama, was employed as an "EDI Clerk" at the Auburn warehouse of Daewon America, Inc. ("Daewon") until he was terminated on October 24, 2017.  (Doc. 1 at 6.)  As both Daewon and Lusk agree (collectively, "Parties"), Daewon fired Lusk not because of any performance or disciplinary issues but because of physical restrictions placed on Lusk by his medical doctor after Lusk was injured in a nonemployment-related motor vehicle accident.  According to Daewon, these restrictions prevented Lusk from performing the essential functions of his job.  For his part, Lusk disagrees.

Pending before the Court is Daewon's Motion for Summary Judgment ("Defendant's Motion") (Doc. 21) filed on August 30, 2019.  Daewon contends that it is entitled to summary judgment on Lusk's claims, all brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq*.  The Court

1

must now resolve two primary issues as advanced by the parties in their respective briefs: what exactly were the essential functions of Lusk's job and whether Lusk could perform those functions given his post-accident permanent restrictions.

Having reviewed the Parties' submissions, the record, and being otherwise fully advised in the premises, the Court finds that Daewon's Motion is due to be DENIED.

## **BACKGROUND**

Lusk began his employment at Daewon in 2008.  (Doc. 1 at 3.)  He first served as a production supervisor at its plant in Opelika, Alabama.  (*Id.*)   At Opelika, he eventually assumed a new position involving a host of inventory control duties.  (*Id.*)  In 2012, he transitioned to the position of an EDI Clerk in Daewon's new Auburn facility.  (Doc. 23-1 at 13, 16.)

Although Daewon had no written job description for this position, as an EDI Clerk, Lusk performed over 40 functions of varying frequency, much of which involved paperwork and inventory.  (*Id.* at 79-82.)  His daily grind also included, as emphasized by Daewon, (1) packing and assembling pallets of spare parts for shipment, (2) packing small pack shipments of spare parts and taking them to the local shipping store for delivery, (3) organizing and storing spare parts for future shipment, (4) scrapping parts, (5) checking inventory and ordering parts, (6) pulling parts from inventory, (7) cleaning the storage shed where parts were stored, and (8)

2

inspecting the "combi-lift," *i.e.* forklift. (*Id.* at 21-23, 79-82; *see also* Doc. 23-2 at 142-43.)  The parts were of various weights, in part or in whole, up to and over 150 pounds.  (Doc. 23-1 at 21, 24; Doc. 23-3 at 9.)

The duties involving the packing and moving of parts could be performed in sundry ways.  For example, as to packing of pallets which required manual banding, Lusk used a forklift to lift the pallets.  (Doc. 23-1 at 23-24; Doc. 23-3 at 10-12.) Whenever Lusk needed assistance in lifting and moving items, he could—and regularly did—obtain assistance from other employees, such as Staci Austin ("Austin") and Bennie Norris ("Norris"), without any noticeable drop in efficiency. (Doc. 23-1 at 22-23; Doc. 23-3 at 5; Doc. 28-2.)

On April 14, 2017, Lusk was involved in a nonemployment-related automobile accident that resulted in a broken leg and injured knee. (Doc. 23-1 at 27.) Due to these painful injuries, Lusk took leave under the Family and Medical Leave Act ("FMLA").  (*Id.* at 28.)[1]  In his absence, Austin performed Lusk's job duties. (*Id.* at 29.)

On July 11, 2017, Lusk's physician authorized his return to work, but with conditions.  Lusk could henceforth work in a light-duty capacity, as he could not lift, and needed regular sitting breaks.  (*Id.* at 30.)  Lusk returned to his old workplace, but he quickly suffered continued pain of such duration and intensity as to render

---

[1] *See* 29 U.S.C. § 2601, *et seq.*

performance of his job duties impossible.  (Doc. 23-1 at 30; Doc. 23-2 at 125.)  He therefore took additional time off beginning July 17, 2017, hoping to finally and fully to recuperate.  (Doc. 23-1 at 30; Doc. 23-2 at 125.)

After Lusk had exhausted the leave period allowed under FMLA and granted by Daewon, his doctor once more released him to return to work on September 25, 2017 but only in a modified, light-duty capacity, with no lifting of more than 40 pounds, no kneeling, frequent breaks, and the ability to periodically sit throughout the day. (Doc. 23-1 at 33.)

Upon receipt and review of these conditions, Daewon's human resources manager, Tracy Sanders ("Sanders"), concluded Lusk was unable to perform the essential functions of his job as an EDI Clerk. (*Id.* at 34-36; *see also* Doc. 23-2 at 18.)  Sanders made this determination after discussing Lusk's restrictions with her supervisor, Simon Oh ("Oh").  (Doc. 23-2 at 18, 20.)  According to Lusk, Sanders, however, did not discuss these restrictions with Lusk before his termination,  much less broach the possibility of any reasonable accommodation. (*Id.* at 17-18.)

Instead, Lusk was officially terminated on October 24, 2017.  (*Id.* at 20.) Daewon gave two reasons for this dismissal: Lusk had exhausted all available leave and was unable to perform the essential functions of his job, with and without accommodation.  (*Id.*)

## LEGAL STANDARD

4

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(a), (c).[2] No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Just as important, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this assessment, the Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted), and "resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F. 2d 1555, 1558 (11th Cir. 1990) (citation omitted).

## **ANALYSIS**

The Complaint alleges that Daewon unlawfully discriminated against Lusk

---

[2] In this Memorandum Opinion and Order, any reference to "Rule []" or "Rules" is to one or more provisions of this procedural compendium.

based on his disability by opting to terminate him rather than provide a reasonable accommodation that would not have imposed an undue hardship on Daewon.  In other words, given a choice between a compromise or separation, Daewon simply terminated an employee with an otherwise acceptable employment record. Unsurprisingly, considering these apparent facts, Lusk advances two ADA claims: (1) failure to provide a reasonable accommodation and (2) discriminatory discharge. Daewon now seeks dismissal of these claims via summary judgment.

## I.      Failure to Provide a Reasonable Accommodation

The core of the Parties' dispute as to Lusk's first claim are diametrically opposed understandings of an employer's statutory duties.  As Lusk maintains, Daewon violated the ADA by refusing to reasonably accommodate his disability. Specifically, Lusk says that Daewon simply ignored the most obvious resolution: had it allowed him to continue to use the accommodations that he already had implemented prior to his injuries (use of a forklift, the ability to sit, and occasional assistance from a co-employee), he could have performed every one of the tasks expected of an EDI Clerk without any fundamentally negative impact on its operations.  For Daewon, Lusk was not a qualified individual under the ADA because Lusk could not perform the essential functions of his job.

Two threshold matters are indisputable.  First, the law is clear that "an employer's failure to reasonably accommodate a disabled individual *itself*

6

constitutes discrimination under the ADA, so long as that individual is 'otherwise qualified,' and unless the employer can show undue hardship." *Holly v. Clairson Industries, LLC*, 492 F.3d 1247, 1249 (11th Cir. 2007); *Crutcher v. Mobile Housing Bd.*, No. Civ. A 04-0499, 2005 WL 2675207, at *11, 2005 U.S. Dist. LEXIS 35402 (S.D. Ala. Oct. 20, 2005) ("It is well settled that an ADA violation occurs when an employer fails to provide 'reasonable accommodations' for an employee with a disability, unless doing so would impose an undue hardship on the employer."). Second, it is the plaintiff who bears the burden both to identify an accommodation and to show that it is reasonable. *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000).

Under the ADA, to state a prima facie claim for failure to accommodate, Lusk must show that: (i) he is disabled; (ii) he is a qualified individual; and (iii) he was discriminated against by virtue of Daewon's failure to offer a reasonable accommodation. *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1255 (11th Cir. 2001).  Daewon's Motion challenges whether Lusk has made a sufficient showing as to the second and third elements of his prima facie case.

In the reasonable-accommodation context, the ADA envisions an "interactive process" by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated. 29 C.F.R. §1630.2(o)(3). This "informal, interactive process . . . should identify the precise limitations

resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* Because the interactive process imposes mutual obligations on employers and employees, an employer cannot be liable for failure to accommodate if a breakdown in that process is attributable to the employee. *Stewart,* 117 F.3d at 1287  Accordingly, an employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc*., 167 F.3d 1361, 1363 (11th Cir. 1999). Indeed, before an employer's duty to provide reasonable accommodations—or even to participate in the "interactive process"—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice. *See Gaston*, 167 F.3d at 1363-64.

Here, some matters can be quickly resolved.  In his view, Lusk has a disability because he has doctor's instructions stating that he had permanent restrictions of no kneeling and no lifting over 35-40 pounds.  Daewon does not argue otherwise.  Lusk also claims that he notified Daewon of his medical restrictions by faxing them to Daewon.  Daewon does not question this either.  Instead, Daewon contests Lusk's assertion that he was a qualified individual.

### A. Whether Lusk Was A Qualified Individual Under the ADA.

To show he was a qualified individual, Lusk must show that he could perform the essential functions of the employment position he held (EDI Clerk) with or

without reasonable accommodation. *Salem v. City of Port St. Lucie*, 788 F. App'x 692, 694 (11th Cir. 2019) (citing *Holly*, 492 F.3d at 1255-56)).[3] "[E]ssential functions are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Holly*, 492 F.3d at 1257 (internal citation and quotation marks omitted); *see* 29 C.F.R. § 1630.2(n)(2)(i).

"Whether a function of a position is essential is evaluated on a case-by-case basis by examining a number of factors, including the employer's judgment of what it believes to be the essential functions, any written description of the position, the amount of time spent on the job performing the function, and the consequences of not requiring the employee to perform the function." *Williams v. Revco Disc. Drug Centers, Inc.*, 552 F. App'x 919, 921 (11th Cir. 2014) (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005)). A job function also may be essential if there are a limited number of existing employees who could perform that particular function. *See* 29 C.F.R. § 1630.2(n)(2)(ii); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997). While an employer may determine what tasks merit this designation, an employer's freedom is limited in that an essential function must be among the class of fundamental job duties of a position that an individual with a disability is actually required to perform.

---

[3] Although unpublished opinions, generally denominated by a cite to the Federal Appendix or some electronic medium, are not considered binding precedent, they may be cited as persuasive authority. 11th Cir. R. 36-2. The Court treats them as such here and elsewhere.

"If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA. In other words, the ADA does not require the employer to eliminate an essential function of the plaintiff's job." *Holly*, 492 F.3d at 1256 (internal citation and quotation marks omitted). "[E]ven a 'relative[ly] infrequen[t]' inability to perform a job's essential functions is enough to render a plaintiff not a 'qualified individual' under the ADA." *Billups v. Emerald Coast Utils. Auth.*, 714 F. App'x 929, 936 (11th Cir. 2018) (quoting *Holbrook*, 112 F. 3d at 1528).

Daewon places much upon this standard.   Thus, in its pending motion, Daewon argues that Lusk is not a qualified individual because, due to the prohibition on his kneeling and lifting of over 40 pounds, he could not physically pack spare parts in pallets and small boxes, lift pallets and small pack boxes, and transport pallets and boxes weighing up to 150 pounds, all purportedly essential functions of an EDI Clerk.  (Doc. 22 at 25-27.)  As support, Daewon directs the Court to Lusk's own deposition testimony, a handwritten job description drafted by Lusk during his absence, and the testimony of Daewon's human resources manager, Lusk's supervisor, and Austin, who filled in for Lusk during his leave of absence  (Doc. 23-3; Doc. 23-5 at 8-10.)   Not content, Daewon further characterizes these lifting, transporting and kneeling obligations as "primary and critical," not just essential,

"functions." (Doc. 22 at 26.) In fact, they were so critical that, according to Daewon, it would need to pull in another employee to meet its customers' expectations for shipping speeds, an action it was not obligated to do under the ADA. (*Id.*)

Crucial to this telling, Daewon gives added emphasis to the job's physical demands by focusing on a single statement made by Lusk in the midst of his deposition in response to a question asking him what Daewon could have done to assist him in performing his job. At that time, Lusk referenced assistance from a helper on Wednesdays and Fridays for a few minutes. (Doc. 23-1 at 38.) Seizing upon this answer, Daewon depicts it as proof that Lusk needed a helper as the sole and singular accommodation that would have allowed him to credibly perform his job duties.

Yet, in reviewing the cited testimony, it is clear that Daewon misconstrues it and attempts to sell it as something that it is not. Simply put, the Court is not swayed that this single line can be regarded as an unqualified statement by Lusk asking for a helper as an accommodation, especially one separate and apart from the occasional assistance he previously received from his co-workers. In any event, Lusk counters that reference by placing it in the context of the occasional help that he historically received from a co-worker.

In response to Daewon's assertions, Lusk insists upon his qualifications because nowhere in his specific job description is there a requirement that he

physically kneel or lift or set out which physical requirements were required. Instead, according to Lusk, he only had to instigate or cause certain tasks to be accomplished (and ensure their completion), whether that be by personally kneeling himself, using a forklift, having someone else provide assistance, or employing yet another method. To do his job, in other words, Lusk had to achieve certain things, but he did not need to personally and directly perform them with his own hands and his own physical body.  The means of performance, it would seem, were discretionary.

As to kneeling, Lusk proffers another counter.  He states that the job functions of his position, *as he actually performed them* while healthy, did not require him to kneel. (Doc. 23-1 at 37-39; Doc. 28-1 at 3-4.)  In point of fact, Lusk has categorically stated that none of his job duties as EDI Clerk at Auburn mandated bended knees or kneeling. (Doc. 28-1 at 3.)

As to lifting, Lusk testified as to that task's limited duration, among other telltale markers of its non-essentiality.  As he explained, he only needed to lift, if ever, for a few minutes on Wednesdays and Fridays.  (Doc. 28-1 at 3.) On these occasions, he historically relied upon a willing coworker, Norris, for assistance. (*Id.*) Crucially, Norris openly confirmed this history of occasional assistance in an affidavit. (Doc. 28-2.)  When Norris was unavailable, Lusk resorted to operating, without any seeming problem, a forklift whenever materials needed to be lifted or

12

moved.  In both circumstances, each task, colored as essential by Daewon, could be (and historically had been) accomplished without undue hardship to Daewon—and by means of the very accommodations that Lusk proposes.  In other words, per Lusk, he could perform the essential functions of his job without any new accommodation because his new restrictions did not change the historical manner in which he had performed the job.  (Docs. 27 at 18-19; 28-1 at 10.)

Under Rule 56, that Lusk accomplished his job tasks in the past without imposing an undue burden on Daewon constitutes probative evidence Daewon could have accommodated his disability. *See, e.g., E.E.O.C. v. Hibbing Taconite Co.,* 720 F. Supp. 2d 1073, 1080 (D. Minn. 2010) (collecting cases with similar holdings) ("The very fact that [the deaf plaintiff] successfully worked at [a different] mine pit is strong evidence that a reasonable accommodation [at defendant's mine pit] could have been possible.").

In this regard, Lusk is further helped by testimony from Daewon's own employees.   For example, when pressed, Sanders, Daewon's human resource manager,  conceded her lack of thorough familiarity with Lusk's job or how Lusk performed it.  (Doc. 23-2 at 22; Doc. 23-3 at 7; Doc. 28-1 at 3.)  Lusk's co-worker, Austin, who briefly performed Lusk's job in his absence, just as readily supports Lusk's cause, for Daewon has failed to account for the fact that Austin performed her job tasks in a different manner.  (Doc. 23-1 at 37-38; Doc. 23-2 at 22; Doc. 28-

1 at 6-8).  This result, as Lusk cogently points out, is due to Daewon's own decisions. Had Daewon adequately engaged in the required interactive process after Daewon was given Lusk's permanent restrictions, it would have had a sufficient understanding of Lusk's "fundamental" job functions as to have no reasonable doubt as to his ability to perform capably even with his physical restrictions.  Indeed, in a most revealing episode, when Daewon had to determine what exactly the position of EDI Clerk entailed, Daewon had to get Lusk to draft a description of the job that he had long fulfilled.  (Doc. 23-1 at 20; Doc. 23-2 at 8-10; Doc. 23-5 at 5-6, 8-9.)  Not to be forgotten, that description ultimately mentioned nothing about kneeling, physically lifting, or physical abilities. (Doc. 23-5 at 23-24.)

In reaching these conclusions, this Court is not blind to two problems.  First, in trying to decipher the Parties' respective positions regarding the essential functions of Lusk's position, it must make sense of a job defined by no written description, let alone a description setting forth such physical requirements as kneeling, sitting, standing, or lifting.  (Doc. 23-2 at 8, 10; Doc. 23-3 at 7.)   Second, it appears that Lusk performed a job that was unique to himself.  In other words, there were no other individuals (at least, no evidence of such has been presented) who also served as EDI Clerks who could testify to the exact physical requirements of the job.  Yet, these problems also highlight a certain verity: the only person who could truly testify as to exactly what Lusk's job entailed was Lusk.  The other

14

evidence submitted by Daewon, in turn, came from individuals with extremely limited knowledge of the position of what Lusk did on a daily basis or how he did it.  In fact, at least according to Austin, the only other person to have performed Lusk's job—although only temporarily—she made up the job as she saw it, performed the tasks she deemed necessary to accomplish the responsibilities at hand, and was never informed of any physical requirements for the job.  (Doc. 23-3 at 8, 14.)

In the end, viewed in the light most favorable to Lusk, considering the probative evidence supplied by Lusk, from past practice to his colleagues' words to more, and the more debatable evidence tendered by Daewon, the Court finds that Lusk has presented sufficient evidence creating a genuine issue of material fact as to whether kneeling and lifting over 40 pounds were "essential functions" of his position as an EDI Clerk and whether the responsibilities of the position could be safely and legally accomplished in the manner that Lusk historically had been performing them.  *See Samson v. Federal Express Corp.,* 746 F.3d 1196, 1200-03 (11th Cir. 2014) (reversing summary judgment because genuine factual dispute existed as to whether test-driving was an essential function of a technician position where the relevant factors were in conflict); *Calvo v. Walgreens Corp.*, 340 F. App'x. 618, 623 (11th Cir. 2009) (determining that a genuine issue of material fact existed regarding whether lifting, carrying, and pushing were essential functions of

the assistant store manager position).  Thus, Lusk has met his burden of showing a genuine issue of material fact as to whether he was a "qualified individual" for the EDI Clerk position.  His success means that Daewon is not entitled to summary judgment on this basis.[4]

## B.   With or Without a Reasonable Accommodation

The final element necessary to establish a prima facie case under the ADA requires Lusk to show that he was discriminated against because of his disability. *See Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014); *Holly*, 492 F.3d at 1255–56.  As noted *supra*, a failure to make a reasonable accommodation to the limitations of an individual with a disability falls within the ADA's definition of discrimination, itself a discriminatory act. 42 U.S.C. § 12112(b)(5)(A); *Holly*, 492 F.3d at 1262.  Consequently, when a disabled employee pleas for some adjustments, an employer must not be blind to the possibility of reasonable accommodations, including: "job restructuring, part-time or modified

---

[4] At the same time, to the extent Lusk argues that a reasonable accommodation without an undue hardship to Daewon would also include transferring him to a position as a forklift operator, the Court concludes that, based on the record, this would not be a reasonable accommodation.  While company paperwork may have suggested there was a position, Lusk has not sufficiently shown that it was an available, open position in October 2017 that Daewon was intending to fill and that could have been made available to Lusk without undue hardship to Daewon.  *See Williams*, 552 F. App'x at 922 (finding that the ADA did not require the employer, CVS, to permanently provide the employee with full-time technical support because this would require the employer to eliminate essential functions of the pharmacist job and reallocate those functions to other employees); *Tetteh v. Waff Television*, 638 F. App'x 986, 988 (11th Cir. 2016) (finding that the ADA does not require an employer to reallocate job duties and, therefore, the employer was not required to have another photographer accompany the employee on her assignments while she was recovering from her injuries).

work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

"The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable." *Earl*, 207 F.3d at 1367.  *See also Stewart,* 117 F.3d at 1286 (employing principle).  This burden cannot be sidestepped, and "an employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'" *Frazier-White v. Gee*, 818 F.3d 1249, 1255-56 (11th Cir. 2016) (quoting *Gaston*, 167 F.3d 1361, 1363-64 (11th Cir. 1999)).  Even then, an employer is not required to accommodate an employee in any manner in which the employee desires. *Gilliard v. Ga. Dep't of Corr.*, 500 F. App'x 860, 868 (11th Cir. 2012) (citing *Stewart*, 117 F.3d at 1285-86).  The ADA does not expect an employer to reallocate job duties in order to change the essential function of the job, or remove another employee from a position in order to accommodate a disabled one. *Holbrook*, 112 F.3d at 1528; *Lucas*, 257 F.3d at 1256. True, an employer may be forced to restructure a particular job by altering or

17

eliminating marginal functions, but it is not bound to transform a position into another by eliminating its previously essential functions. *Lucas*, 257 F.3d at 1260. Under the ADA, it is thus the plaintiff who bears the burden of identifying an accommodation and demonstrating that the accommodation allows him to perform his position's key tasks. *Id.* at 1255.

The ADA also imposes a procedural vision. Under the ADA, an employer may need "to initiate an informal, interactive process" with the employee to identify his limitations and possible accommodations. 29 C.F.R. § 1630.2(o)(3). But when a plaintiff fails to demonstrate the existence of a reasonable accommodation, "the employer's lack of investigation into reasonable accommodation is unimportant." *Earl*, 207 F.3d at 1367 (quoting *Willis v. Conopco, Inc.*, 108 F.3d 282, 285-86 (11th Cir. 1997));[5] *see also Knowles v. Sheriff*, 460 F. App'x. 833, 835 (11th Cir. 2012) (holding that "where the employee failed to identify a reasonable accommodation, the employer had no affirmative duty to engage in an interactive process") (citation and internal quotation marks omitted).

In Daewon's Motion, it opts for a narrow line of attack. It does not argue that Lusk failed to request an accommodation, let alone the accommodations that Lusk

---

[5] The Court notes that the ADA provides no cause of action for failure to investigate the viability of any and all possible accommodations. *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010).

claims were reasonable, as it in good faith cannot.[6]  Instead, Daewon states that,

through Sanders, it "reviewed multiple doctor's notes, including the October 4, 2017

note identifying permanent restrictions and the Medical Inquiry Form," "spoke with

Plaintiff about possible accommodations," "complet[ed] a thorough investigation

into Plaintiff's job duties as EDI Clerk, his work restrictions, and possible

accommodations," and properly and sufficiently "engaged in an interactive process

with Plaintiff." (Doc. 22 at 34.)  It also, as already discussed and makes much hay

out of Lusk's reference to possible assistance from a helper for a few minutes on

Wednesdays and Fridays.  (Doc. 23-1 at 38.)

Ultimately, two conclusions doom Daewon's defense in this regard.  First, the

record does not incontestably demonstrate that Daewon, in the person of Sanders or

others, actually engaged in a full participatory discussion with Lusk as to his

requested accommodations.   Lusk's evidence intimates that Daewon did not,

Daewon's proof says otherwise, and neither has demonstrated the absence or

presence of good faith negotiations or honest efforts by both sides.  *See, e.g.*, *Calero-

Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 24 (1st Cir. 2004) ("An employer's

refusal to participate in the process may itself constitute evidence of a violation of

---

[6] Since Daewon does not argue in its initial brief that Lusk failed to make a specific demand for an accommodation, the Court will not undertake consideration of that issue and will assume that such an accommodation request was made.  *See Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) (explaining that a court need not consider arguments or issues raised for the first time in a party's reply brief).

the statute."); *Carroll v. England*, 321 F. Supp. 2d 58, 69 (D.D.C. 2004) ("[W]hen the duty to reasonably accommodate arises; both employee and employer must exchange essential information and neither side can delay or obstruct the process[.]").

Second, these issues effectively mirror the same general disputed issues of material fact as to exactly what were the essential functions of Lusk's job and how Lusk performed them. Here, there is too much conflicting evidence as to whether Lusk was performing the essential duties of his position. When the evidence can go both ways, it is not for this Court to weigh their true import.

Accordingly, viewing the evidence in the light most favorable to Lusk, Lusk has shown a genuine issue of material fact as to whether he needed an accommodation, and if he did, whether the lifting assistance could be provided without any undue hardship on Daewon and without violation of any federal workplace safety rules.[7]

## II.     Discriminatory Discharge.

The other claim Lusk asserts in this lawsuit is that Daewon terminated his employment because of his disability in violation of the ADA. The familiar burden-

---

[7] While it may very well be that Lusk's manner of performing some of his job responsibilities, particularly those at issue, violate Occupational Safety and Health Administration ("OSHA") standards, Daewon has not sufficiently developed that issue for purposes of this Court's summary judgement analysis. Moreover, the record contains conflicting testimony as to whether OSHA regulations are implicated in the context of Lusk's manner of performing his job.

shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims. *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999). Under this paradigm, claims of employment discrimination based on a disability can be proven through (1) direct evidence, (2) circumstantial evidence, or (3) statistical proof. *See Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). In this case, Lusk argues that he has direct evidence of discrimination, as well as circumstantial evidence, and therefore the Court focuses its inquiry on those two mechanisms.

### A. Direct Evidence

"Direct evidence of discrimination is 'evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee' and 'that, if believed, proves the existence of a fact without inference or presumption.'" *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)); *see also Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1358 (11th Cir. 1999) ("We have defined direct evidence of discrimination as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."). "Only the most blatant remarks, whose intent could be nothing other than to discriminate . . .

constitute direct evidence of discrimination." *Carter v. Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

Unsurprisingly, the Parties diverge as to this issue.  Lusk argues there is direct evidence of discrimination on the basis of his disability because Daewon's witnesses and internal documentation surrounding his termination confirm his termination was tied to his disability and nothing else, especially since Lusk could perform the specific tasks of the job.  (Doc. 27 at 32.)  Disputing this suggestion, Daewon counters with the claim that the evidence clearly shows that Lusk was terminated because of his inability to perform his job and that there was no evidence that it was because of his disability.  (Doc. 29 at 24-25.)

This Court agrees that the evidence cited by Lusk does not fit this narrowly circumscribed category.  By any fair measure, Lusk's cited evidence does not evidence the type of blatant, unequivocal and unconditional remarks whose intent could be nothing other than to discriminate based on disability.  *See, e.g., Curry v. Wilkie*, No. 2:12-CV-0608-SLB, 2019 WL 1226112, at *10 (N.D. Ala. 2019).  The law treats only such unambiguous evidence as direct.

### B. Circumstantial Evidence

There being no direct evidence of discrimination, the Court turns to the traditional *McDonnell Douglas* burden-shifting analysis.  *Holly*, 492 F.3d at 1255; *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004);

*Wascura v. City of South Miami,* 257 F.3d 1238, 1242 (11th Cir. 2001).  Under this methodology, the plaintiff must initially establish a prima facie case of discrimination, after which the burden of production shifts to the defendant to articulate a legitimate non-discriminatory reason for the challenged action. *Cleveland,* 369 F.3d at 1193; *Wascura,* 257 F.3d at 1242.  After a non-discriminatory reason is given, the plaintiff is left with the ultimate burden of proving that the employer intentionally discriminated against him because of his disability. *Cleveland,* 369 F.3d at 1193; *Wascura,* 257 F.3d at 1243.

To establish a prima facie case of disparate treatment under the ADA, Lusk must show that: (i) he has a disability; (ii) he is a qualified individual; and (iii) the employer discriminated against him because of his disability. *See Greenberg v. BellSouth Telecomms., Inc.,* 498 F.3d 1258, 1263 (11th Cir. 2007); *D'Angelo v. ConAgra Foods, Inc.,* 422 F.3d 1220, 1226 (11th Cir. 2005).

As to Daewon's first argument—that Lusk cannot establish a prima facie case of discriminatory discharge because Lusk is not a qualified individual —the inquiry is the same as it was under the failure to accommodate claim.  Since the Court already has concluded there is a question of fact on that issue in the context of Lusk's failure to accommodate claim, it will not address it further.

The second argument raised by Daewon—that Lusk cannot meet his third prima facie element by showing a discriminatory motive or that he was terminated

solely because he suffered from a disability—demands more attention. The basis of this argument is Lusk's testimony that he never had any issues with Sanders or Oh and that Sanders did everything in her power to return Lusk to work. (Doc. 22 at 36.) Yet, Lusk disputes Daewon's characterizations of the evidence. (Doc. 27 at 33-34.) As he explains, Sanders did not speak with him about how he performed his job and did not talk with him about accommodations prior to terminating him. (Doc. 23-2 at 17-18; 27 at 10;  28-1 at 10.) Lusk also cites to testimony indicating that Sanders has never provided an accommodation to any Daewon employee before and that Daewon has no policy governing accommodations. (Doc. 23-2 at 24, 33, 35, 37; 27 at 10-11.)  Lusk is under no obligation to show non-disabled individuals who were treated more favorably.

As stated above, the third and final element of Lusk's prima facie case requires him to present sufficient evidence to establish that he was discriminated against because of his disability. *See Mazzeo*, 746 F.3d at 1268 (citing *Holly*, 492 F.3d at 1256); *Greenberg*, 498 F.3d at 1263).  As such, Lusk must show that he suffered an adverse employment action and that his disability was the determining factor in, and the but-for cause of, his termination. *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1073-74 (11th Cir. 1996). So bound, a "plaintiff complaining of discriminatory discharge under the ADA must show that his or her employer would not have fired him but for his actual or perceived disability." *Savage v. Secure First*

*Credit Union*, 107 F. Supp. 3d 1212, 1217 (N.D. Ala. 2015), *rev'd on other grounds*, No. 15-12704, 2016 WL 2997171, at *1 (11th Cir. May 25, 2016).  Further, if and once a defendant articulates a legitimate, non-discriminatory reason for the termination, the plaintiff must show that the reason is pretext for unlawful disability discrimination.  *Wascura*, 257 F.3d at 1243.

Lusk must have introduced some circumstantial evidence of Daewon's animus that could be seen as causally linking the adverse action with his disability. *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011) (plaintiff must marshal "circumstantial evidence that creates a triable issue concerning the employer's *discriminatory intent*") (emphasis added)).  *Smith v. Lockheed–Martin Corp.* provides the outer bound for satisfying a prima facie Title VII discrimination claim because it permits evidence that meets the *McDonnell Douglas* criteria (*i.e.,* comparators) as well as "various [other] forms" that make a "convincing mosaic" of an employer's discriminatory animus.  *Id.*  Although the Eleventh Circuit has not delineated what other forms of evidence count, even under the "convincing mosaic" framework, an inference of "intentional discrimination" is not permitted unless "something links the actions to the employee's" protected class. *Turner v. Fla. Prepaid Coll. Bd.,* 522 F. App'x 829, 833 (11th Cir. 2013).  Consistent with this body of precedent, Lusk must raise that link upon a challenge to his prima facie case—or if he declines to do so then—at least at the pretext stage.  Permitting

otherwise would vitiate Congress' carefully calibrated statutory regime. Any disabled person on the receiving end of an adverse employment action would then have grounds to sue his employer.

In viewing the evidence in the light most favorable to Lusk, the Court concludes Lusk has presented sufficient evidence to meet his burden. Here, there is no credible doubt that Lusk satisfactorily performed his job before his accident— and that he satisfactorily performed his job *in the manner* in which he can continue to perform it despite his medical restrictions. Daewon has not challenged these aspects of his story. Moreover, no dispute that Lusk had a disability and had disability-related restrictions and was terminated for reasons solely related to these restrictions exists, nor can one be conjectured. Indeed, no one, certainly not Daewon, has questioned Lusk's competence or claimed that previous adjustments had somehow led to questions as to his fitness. The existing record lacks evidence suggesting that Lusk was a poor employee or had any disciplinary issues, let alone any issues that warranted his termination after his years of tenure. Furthermore, there is no question that Lusk's termination came almost immediately after Daewon was given Lusk's disability-related restrictions. And finally, on top of all these things that the Parties' evidence both shows and does not show, there remains no argument that Lusk's supervisor and the HR representative, the sole decision-makers who controlled the process of and dictated Lusk's termination, were aware of these

issues.

That Daewon argues the termination decision was based not on Lusk's disability but simply because of his inability to perform his job due to his restrictions, only underscores the propriety of this conclusion because the evidence as to the relevant decision-making process reveals that it was inextricably tied to a medical condition that Lusk argues did not prevent him from performing his job.  With all this evidence before it, a reasonable jury very well could conclude that Lusk's termination was because of his disability, especially given the temporal proximity of events and the evidence from Lusk that he could perform the job regardless of any physical restrictions.    Accordingly, the Court finds that Lusk has presented sufficient evidence of his prima facie case of disability discrimination.

With this finding, the burden shifts to Daewon to offer a legitimate, non-discriminatory reason for taking the allegedly discriminatory action. *See, e.g.*, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  To meet this threshold, Daewon describes its legitimate, nondiscriminatory reason for terminating Lusk thusly: Lusk "was unable to perform his job duties, after exhausting all available leave and after Daewon determined there were no open positions that Plaintiff was capable of performing with his restrictions."[8]  (Doc. 22 at 37.)  Daewon goes on to

---

[8] It is true that a doctor's refusal to release a person to return to work without restriction can be a legitimate reason for an employer to prevent that person from returning to work.  *See* 42 U.S.C. § 12112(d)(4) (an employer may ask for medical documentation that is "shown to be job-related and

assert that Lusk has "absolutely no evidence that the reason given for his termination was false or that the true reason for his termination was his disability." (*Id.* at 37-38.)

After the employer presents a legitimate, nondiscriminatory reason for its action, as Daewon has done, "the plaintiff must introduce significantly probative evidence that the asserted reason is merely a pretext for discrimination" in order to avoid summary judgment. *Brooks v. Cnty. Comm'n of Jefferson Cnty.,* 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation and alteration omitted). A plaintiff may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reason, *id.* at 1163, or by producing other evidence "which permits the jury to reasonably disbelieve the employer's proffered reason," *Steger v. Gen. Elec. Co.,* 318 F.3d 1066, 1079 (11th Cir. 2003). "Any believable evidence which demonstrates a genuine issue of fact regarding the truth of the employer's explanation may sustain the employee's burden of proof" on this point. *Steger,* 318 F.3d at 1079.

---

consistent with business necessity" and "may make inquiries into the ability of an employee to perform job-related functions"); *Collado v. United Parcel Serv., Co*., 419 F.3d 1143, 1159 (11th Cir. 2005) (noting with approval UPS's requirement that its diabetic drivers complete a medical program before being allowed to drive trucks); *Kincaid v. City of Omaha*, 378 F.3d 799, 804-05 (8th Cir. 2004) (stating that the city's requirement that a doctor provide a release prior to an injured person's returning to work was a legitimate, nondiscriminatory reason for refusing to allow a non-released person to work); *Revels v. Lucent Techs., Inc*., 60 F. App'x 740, 745-46 (10th Cir. 2003) ("The goal of the release requirement—to ensure that returning to work does not hamper recovery—is rational and legitimate.").

Lusk makes quick work of Daewon's stated reason. He argues he has presented evidence that he was ready and capable of returning to work as an EDI Clerk. Logically, Daewon's statements that he was unable to perform his job, that there was no open position for him, and that he had exhausted all leave, were hollow, subterfuge inconsistent with apparently incontrovertible facts. How could it be otherwise since Lusk sought no further leave of absence and was ready for work in the same manner as before, regardless of whether or not he had restrictions? This very question is one of fact as to whether the new restrictions were with or without consequence, an issue of great consequence for Daewon's liability under the ADA.

With this entire record before it, a jury could conclude that Lusk could perform his old job, whether fettered or unhampered by relatively manageable restrictions. Viewing the evidence in the light most favorable to Lusk, as the Court must do, Lusk has thus produced evidence which could permit a jury to disbelieve Daewon's stated reason for refusing to allow him to work – that he could not perform the essential functions of the job. *See Steger,* 318 F.3d at 1079. Having done so, he has laid bare the simple truth that a genuine issue of material fact exists on this point too.

## <u>CONCLUSION</u>

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Daewon's Motion for Summary Judgment (Doc. 21) is **DENIED**. Since the Court

29

did not rely upon the declaration testimony sections made the basis of the Daewon's Motion to Strike,  Or In the Alternative, Notice of Objections (Doc. 30), the Motion to Strike is **DENIED** as moot.

DONE, this 11th day of June, 2020.

_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE